## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TYSHAUN ST. VALLIER, | : | |
| | : | Civil Action No. 13-6118 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

**WIGENTON**, District Judge:

Presently before the Court is the amended motion of Tyshaun St. Vallier ("Petitioner") to vacate, set aside, or correct his sentence brought pursuant to 28 U.S.C. § 2255.  (ECF No. 6). Petitioner initially filed his motion to vacate sentence in late September 2013.  (ECF No. 1). Following an order (ECF No. 4) advising Petitioner of his rights pursuant to *United States v. Miller*, 197 F.3d 644 (3d Cir. 1999), Petitioner filed his amended motion to vacate sentence on or about February 18, 2014 (ECF No. 6).  Petitioner thereafter filed a supplemental brief raising new claims on or about March 11, 2015 (ECF No. 22).  Following several extensions, the Government responded to Petitioner's amended motion and supplemental brief by way of an answer filed on September 11, 2015.  Petitioner filed a reply brief on or about November 30, 2015.  (ECF No. 38). Also before the Court is Petitioner's motion for discovery (ECF No. 38).  The Government filed a response to that motion (ECF No. 41), to which Petitioner has replied (ECF No. 42).  For the following reasons, this Court will deny Petitioner's motion for discovery, will deny Petitioner's motion to vacate his sentence, and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its decisions affirming Petitioner's conviction, the Third Circuit provided the following

basic summary of the facts which led to Petitioner's arrest in this matter:

> [Petitioner] and Ezra McCombs ("McCombs") were involved in a
> conspiracy to import cocaine into the United States from Trinidad.
> As part of the conspiracy, [Petitioner] recruited a family friend
> named Charisse LaRoche ("LaRoche") to assist in the smuggling of
> the drugs, helping her to get a passport and paying for her flight to
> Trinidad.
>
> In early May 2007, [Petitioner], McCombs, and LaRoche traveled
> to Trinidad, where they met an individual named "Trini" who
> provided them with the drugs they would thereafter import into the
> United States.  [Petitioner] and McCombs gave LaRoche a tubular
> bottle of cocaine, together with some lubricant, and instructed her to
> hide the tube in her vaginal cavity.  LaRoche complied.  The
> remaining cocaine was hidden in the railings of suitcases, and in
> toiletry bottles and containers packed amongst their personal
> belongings.  The group then traveled to the airport and returned to
> the United States.

*United States v. St. Vallier*, 488 F. App'x 628, 630 (3d Cir.), *cert. denied*, --- U.S. ---, 133 S. Ct.

368 (2012).

> On May 6, 2007, [Petitioner, McCombs, and LaRoche returned] to
> Newark, New Jersey.  Upon arrival at Liberty International Airport
> in Newark, each individual proceeded to separate customs lines.
> Unbeknownst to them, officers working for United States Customs
> and Border Protection had flagged them for secondary inspection.
> Accordingly, customs officers escorted all three individuals to a
> secondary inspection area of the airport.  On the way, [Petitioner]
> was taken to the baggage claim to retrieve his single checked item
> of luggage.
>
> Following arrival in the secondary inspection area, Customs
> Officer Jorje Erraez questioned [Petitioner].  In response to Officer
> Erraez's questions, [Petitioner] indicated that he had travelled to
> Trinidad for vacation.  He additionally stated that he knew
> McCombs, but denied knowing LaRoche.  Officer Erraez thereafter
> confronted [Petitioner] with a copy of LaRoche's travel itinerary,
> which he had located in [Petitioner]'s single checked luggage bag.
> [Petitioner] then acknowledged knowing LaRoche, and stated that

she was McCombs' girlfriend.  No Miranda warnings were provided prior to questioning [Petitioner].

Upon discussion, Officer Erraez and other customs officers who had separately interviewed LaRoche and McCombs discovered inconsistencies in each individual's responses.  Notably, McCombs stated that LaRoche was [Petitioner]'s girlfriend, directly contradicting [Petitioner].  Based on this and other inconsistencies, Officer Erraez obtained permission from his supervisor to conduct a personal search of [Petitioner].  Although no contraband was found, Officer Erraez located a credit card used to acquire LaRoche's plane ticket and several thousand dollars in cash.

Meanwhile, based on inconsistent statements made by LaRoche, customs officers obtained permission to search three suitcases checked in her name.  Customs officers discovered within a large amount of powder and liquid cocaine.  LaRoche was then escorted to a personal search room where she admitted to concealing cocaine inside her body as well.  In addition, LaRoche made statements implicating [Petitioner] in the smuggling plan.  In total, 3,280 grams of liquid and powder cocaine were seized from LaRoche's three suitcases and body.

Upon learning that customs officials had discovered cocaine, Officer Erraez ceased questioning and searching [Petitioner]. Shortly thereafter, agents from Immigration and Customs Enforcement ("ICE") arrested both [Petitioner] and McCombs.  ICE provided [Petitioner] a written statement of rights including Miranda warnings.  [Petitioner] chose to exercise his Miranda rights.

On July 24, 2007, a grand jury sitting in Newark, New Jersey, returned a two-count indictment against [Petitioner] charging him with one count of knowingly and intentionally importing 500 grams or more of cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(2)(B), and one count of conspiracy to import 500 grams or more of cocaine into the United States contrary to 21 U.S.C. §§ 952(a) and 960(b)(2)(B), in violation of 21 U.S.C. § 963.

*United States v. St. Vallier*, 404 F. App'x 651, 653-54 (3d Cir. 2010), *cert. denied*, 563 U.S. 1000

(2011).

Following his arrest, Petitioner was released on $ 250,000 bail and retained Paul Bergrin,

Esq., to represent him at trial.  On July 27, 2007, before Petitioner's arraignment, however, the

3

Government submitted a letter to the Court informing the Court that Bergrin was currently subject to criminal charges in New York based on his participation in an escort agency involved in prostitution and having "perpetuated a fraud" on the New Jersey Parole Board and New York courts. (Document 1 attached to ECF No. 34). The letter further informed Petitioner and the Court that Bergrin was also being investigated by the United States Attorney for the District of New Jersey for other offenses. (*Id.* at 3). The Government therefore requested that the Court hold a conflict hearing to provide Petitioner with ample opportunity to consider the potential conflicts of interest arising out of these facts and to decide whether to waive his right to conflict-free counsel or to acquire different representation. (*Id.* at 3-5).

Based on this letter, the Court held a conflict hearing on August 15, 2007. At that hearing, the Government reiterated the potential for a conflict of interest, which Bergrin acknowledged, and the Court conducted a colloquy with Petitioner to determine whether he understood the potential conflict and wished to waive his right to conflict free counsel. (Document 2 attached to ECF No. 34). In that colloquy, the Court first established that Petitioner understood English, had graduated from high school, and was free from any conditions or medications which would impugn his ability to understand. (*Id.* at 3-5). During this colloquy, Bergrin informed the Court that he had previously represented Petitioner in a prior criminal matter, and Petitioner stated that he had had other attorneys in both civil and criminal matters. (*Id.* at 5). The following then occurred:

> THE COURT: Okay. Are you aware that Mr. Bergrin has been indicted on criminal charges by a grand jury in New York county?
>
> [Petitioner]: Yes.
>
> THE COURT: And are you aware that allegations have been made that he is also under investigation by the United States Attorney's Office for this district of New Jersey?
>
> [Petitioner]: Yes.

4

THE COURT: Are you aware that the United States Attorney's Office is the same office responsible for prosecuting your case?

[Petitioner]: Yes.

THE COURT: Do you understand that there are bar disciplinary committees -- when I talk about bar, I mean for attorneys, that have power to discipline, suspend or disbar an attorney. You understand that?

[Petitioner]: Yes.

THE COURT: And do you understand that Mr. Bergrin might have concerns that such disciplinary entities could investigate his conduct and take disciplinary action against him?

[Petitioner]: Yes.

THE COURT: Do you understand that Mr. Bergrin knows that he has been indicted on criminal charges in New York and that he may be the subject of an investigation by the United States Attorney's Office, and that these facts might conceivably create a conflict of interest from your perspective? Do you understand that Mr. Bergrin might conceivably be tempted to curry favor with the Court or the Government, or take other actions that might not be to your benefit, in order to assist himself or otherwise defend himself from the pending prosecution against him?

[Petitioner]: Yes.

THE COURT: Do you understand, in other words, that it is hypothetically possible that your attorney feels a loyalty to his own interests rather than to your interests?

[Petitioner]: Yes.

THE COURT: Do you understand that this could conceivably affect the way in which you -- the way in which he represents you in your case?

[Petitioner]: Yes.

THE COURT: Are you dissatisfied in any way with Mr. Bergrin's representation of you in this case up to this point?

[Petitioner]: No.

THE COURT: Do you understand that the greatest danger is the inability to foresee all the conflicts that may arise? You understand that?

[Petitioner]: Yes.

THE COURT: Describe in your own words what your understanding of potential conflicts of interest arising in this situation might be. Can you give me an idea of what your understanding, your perspective is?

[Petitioner]: I understand that if some event was to happen whereas though his situation is not looking well, that something could change and he'll be able to, well, I can't -- what I'm trying to say, that basically I understand, for his own good, he can -- there is a possibility that he can, but I don't believe that he will, do anything to jeopardize my case. I believe -- I'm informed completely and I got a lot of trust in my attorney to represent me to the fullest power.

THE COURT: Okay. Alright. Do you understand that in every criminal case, including yours, that you are entitled to the assistance of counsel whose loyalty is to -- whose loyalty to you is undivided and who is not subject to any force or consideration that might in any way intrude upon the attorney's loyalty to his or her client's interest?

[Petitioner]: Yes.

THE COURT: Have you received any inducements, promises or threats with regard to the choice of counsel in this case?

[Petitioner]: No.

THE COURT: Have you discussed with Mr. Bergrin the potential conflict of interest?

[Petitioner]: Yes.

THE COURT: Have you consulted with counsel, other than Mr. Bergrin, about the hazards of the potential conflicts of interest?

[Petitioner]: No.

THE COURT: Do you understand that you do have a right to consult with a lawyer, other than Mr. Bergrin, to determine whether you wish Mr. Bergrin to represent you?

[Petitioner]: Yes.

THE COURT: Do you also understand that the Court will give you an opportunity to do so and that the Court encourage you to do so?

[Petitioner]: Yes.

THE COURT: Do you understand that if you cannot afford other counsel, the Court will appoint counsel to consult with you about these specific conflicts of interest issues and/or to represent you?

[Petitioner]: Yes.

THE COURT: And at this time, what is your understanding of your right to effective assistance of counsel.

[Petitioner]: I understand, you explained to me, I just want to go along with Mr. Bergrin being my attorney for the remainder of the case.

THE COURT: Okay. Is there anything that you would want me to explain any further?

[Petitioner]: No.

THE COURT: And I will give you an opportunity, as I indicate, to think about what you've been told and to talk it over with counsel, other than Mr. Bergrin.  Although you indicated that you are satisfied with Mr. Bergrin, after you have in fact thought it over, I'm going to ask that you -- whether you've considered the matters that the Court has talked to you about here today, and whether you've done that with or without an attorney.  At that time as well I will ask whether you wish to continue with Mr. Bergrin as your attorney.  I won't ask you that today, but we do have Mr. McMahon, who is here from the Federal Public Defender, who I'm going to appoint to speak to you directly about this potential conflict of interest and we will return[.]

(Document 2 attached to ECF No. 34 at 5-9).

Petitioner returned to Court on September 4, 2007, for a second conflict hearing after having had an opportunity to speak with the appointed conflicts counsel.  At that hearing, the following colloquy occurred:

> [THE COURT]: This is the date that we set down, it's a second proceeding with regard to the conflict hearing which was conducted on August the 15th.  And at this time I'm just going to inquire of you, Mr. McMahon, whether you've had the opportunity to speak with Mr. [Petitioner] and what those conversations consisted of.

> MR. McMAHON: Your Honor, I spoke with [Petitioner] actually after the last court date and I reviewed with him much of the context -- much of the questions which are contained in the second proceeding heading.   And I reviewed also what your Honor had previously gone through with him in court.  The results of those questions were that [Petitioner] did wish to remain with Mr. Bergrin as his attorney, did not feel that there would be a conflict, although I did explain to him that one does -- one could exist because of the predicament.

> THE COURT: Okay.  Alright.  We'll place you under oath, again, [Petitioner].

> [Petitioner was then placed under oath.]

> THE COURT: Alright, [Petitioner], you're under oath and I'm going to ask you a series of questions.  This is to be taken in conjunction with the questions that were posed to you on August the 15th.  At this time have you had enough time to consider the matters we discussed on August the 15th?

> [Petitioner]: Yes.

> THE COURT: And have you taken the time to discuss with Mr. McMahon the matters the Court discussed with you at that time?

> [Petitioner]: Yes.

> THE COURT: And what -- Mr. McMahon obviously is present in court and has placed on the record the fact that he did in fact speak with you.  Was that time sufficient?

> [Petitioner]: Yes.

8

THE COURT: Do you have any questions about the issues the Court raised regarding a conflict of interest at this time?

[Petitioner]: No.

THE COURT: And have you considered the way in which Mr. Bergrin's personal legal situation may affect his representation of you?

[Petitioner]: Yes.

THE COURT: Alright.  And do you still wish to proceed in this case with Mr. Bergrin as your attorney?

[Petitioner]: Yes.

THE COURT: What do you understand your waiver to date to mean?

[Petitioner]: Sorry.

THE COURT: What do you understand your waiver of any conflict of interest to mean?

[Petitioner]: I understand that I waive -- basically I'm waiving my rights on grounds of -- on appeal, that were raised and the fact that Mr. Bergrin, you know, there's a conflict in that type of scenario. He explained to me in complete detail everything that I'm waiving. I still want Mr. Bergrin to be my attorney.

THE COURT: Okay.  Alright.  And you do understand that you're waiving your right to legal representation that is free from any conflict of interest?  You are waiving that right, you understand that?

[Petitioner]: Yes.

THE COURT: And is anyone promising you anything or threatening to you make this waiver?

[Petitioner]: No.

THE COURT: Alright.  And you are doing this voluntarily?

[Petitioner]: Yes.

> THE COURT: And you understand obviously the ramifications of your decision?
>
> [Petitioner]: Yes.
>
> THE COURT: Okay. [Attorney for the Government,] anything you want to add to that?
>
> [The Government]: No, your Honor, satisfactory.
>
> THE COURT: Okay. Alright. In light of what you've placed on the record, [Petitioner], the Court will permit Mr. Bergrin to continue in your -- in his representation of you.

(Document 3 attached to ECF No. 34 at 2-6). This Court thus concluded that Petitioner had made a knowing and voluntary waiver of his right to conflict-free counsel, and permitted Petitioner to proceed with Bergrin as his attorney.[1]

On July 11, 2008, Petitioner's attorney received a proposed plea agreement from the Government. (Document 6 attached to ECF No. 34). Pursuant to this agreement, Petitioner would have pled guilty to both charges of the original indictment in return for no further charges and a proposed Guidelines level of 25. (*Id.*). No agreement was ever reached, however.

On July 21, 2008, Petitioner failed to show up for a hearing on all of his pre-trial motions, with his trial scheduled to begin the following week, dates that had been set and known since April 2008. (*See* Docket Sheet for Docket No. 07-613). The court then entered a bench warrant for Petitioner's arrest as a result. (*See* Document 8 attached to ECF No. 34 at 6-7). Petitioner thereafter cut his electronic monitoring bracelet, placed it in a dumpster in Harlem, and fled

---

[1] Petitioner returned for a third conflict hearing in November 13, 2007. That hearing, however, concerned a potential conflict between McCombs and his attorney based on the misconception that McCombs' counsel at one point represented Bergrin in his criminal matter, which apparently was not the case. (*See* Document 5 attached to ECF No. 34). In any event, during that third hearing, Petitioner once again reiterated that he understood the situation and continued to be satisfied with Bergrin's representations and wished to proceed with Bergrin as his attorney. (*Id.* at 14-15).

10

prosecution.  (*Id.*).  Petitioner remained at large, missing his original jury selection date, until he was captured by the United States Marshals on October 2, 2008, in Maryland.  (*Id.* at 7-8).

Petitioner was thereafter brought back before this Court on October 10, 2008.  (Document 9 attached to ECF No. 34).  At that hearing, Petitioner's counsel stipulated to the revocation of his bail and his continued incarceration pending trial.  (*Id.* at 1-4).  Following that stipulation, this Court again inquired into Petitioner's satisfaction with Bergrin's representation:

> THE COURT: All right. We're back on the record.  Mr. St. Vallier, I just want to inquire of you with respect to counsel that you are still going to remain under the representation of Mr. Bergrin. Is that correct?
>
> [Petitioner]: Yes.
>
> THE COURT: And you're satisfied with his services?
>
> [Petitioner]: Yes.
>
> THE COURT: Okay.  The Court is also satisfied, based on counsel's representations as well, that your continuation regarding representation will go forward.

(*Id.* at 4).

Petitioner was offered a second plea agreement in October 2008.  (Document 10 attached to ECF No. 34).  Under the agreement, Petitioner would have pled guilty to both counts of the original indictment in exchange for no further charges, including for failure to appear, and a recommended guidelines level of 28.  (*Id.*).  Although Bergrin and the U.S. Attorney's Office apparently discussed it on several occasions, no plea agreement resulted.  The Government thereafter sought and acquired a superseding indictment on November 20, 2008, which included the two original offenses and a new charge for failure to appear in violation of 18 U.S.C. § 3146(a)(1).  (Docket No. 07-613 at ECF No. 60).

On December 18, 2008, Bergrin filed a motion to withdraw as Petitioner's attorney. (Docket No. 07-613 at ECF Nos. 66, 67, 72). In a letter submitted in support of that motion, Bergrin stated that Petitioner "has made numerous misrepresentations as to his acceptance of the plea as offered by the U.S. Attorney's Office and he has stated that he has no confidence in [Bergrin's] ability to defend him" and that communications between the two had broken down. (Docket No. 07-613 at ECF No. 66). In another submission, Bergrin clarified that Petitioner insisted he wanted new counsel, had "totally misrepresented to counsel . . . his firm intent to accept the plea as offered" despite multiple visits to discuss the plea, and that Petitioner had essentially fired him and refused to deal with him further. (Docket No. 07-612 at ECF No. 67).

This Court held a hearing on the motion to withdraw on December 22, 2008. (Document 11 attached to ECF No. 34). At that hearing, Bergrin stated that he and Petitioner had disagreed about the merits of Petitioner's case, and that their ability to communicate had broken down. (*Id.* at 3). Petitioner in return stated for the first time that Bergrin "seemed dishonest" to him and that he "wasn't trusting anything that was being said, or done" by Bergrin. (*Id.*). Petitioner also stated that he could no longer afford a private attorney. (*Id.* at 4). This Court thus granted the motion to withdraw, and ultimately appointed Ruth Liebesman to represent Petitioner going forward on January 7, 2009. (Docket No. 07-613 at ECF No. 75).

Following an apparent breakdown of plea discussions, Petitioner ultimately chose to openly plead guilty to the failure to appear charge prior to his trial on the remaining charges. This Court thus held a plea hearing as to that charge on March 30, 2009. (Document 12 attached to ECF No. 34). At that hearing, this Court first questioned Petitioner and ascertained that he understood the maximum penalties associated with the offense, understood the advisory nature of the guidelines and that he would not be able to withdraw his plea on the basis of his disagreement

12

with his sentence, and that Petitioner had discussed the matter with his new attorney to his satisfaction.  (*Id.* at 3-5).  This Court then conducted a colloquy on the factual basis for Petitioner's guilty plea.  During that colloquy, Petitioner admitted that he had been arrested in May 2007, had been released on $ 250,000 bail and placed under electronic monitoring, was scheduled to appear on July 21, 2008, for a pretrial hearing and on July 23, 2008, for jury selection, had failed to appear on either date, had cut off his electronic monitoring bracelet on July 21, 2008, had specifically written to the Court in August 2008 stating that he knew he was required to attend those hearings and chose not to, and that he had ultimately been captured by the Marshals in October 2008.  (*Id.* at 5-8).  Based on these admissions, the Court accepted Petitioner's guilty plea.  (*Id.* at 9-10).

The parties returned to court for a pre-trial hearing on April 20, 2009.  (Document attached to ECF No. 34).  Due to a mix-up in the U.S. Attorney's Office, Petitioner had not been brought to the court by the time the hearing began.  (*Id.* at 3-4).  Agents were dispatched to retrieve Petitioner.  (*Id.* at 4-5).  While waiting for his retrieval, Liebesman agreed to waive Petitioner's presence "to the extent [that she could] do so without speaking to him first."  (*Id.* at 5).  Liebesman recognized that she wouldn't normally waive his presence at an important hearing without his prior agreement, but agreed that the parties could discuss certain issues – voir dire questions, jury selection issues, and argument on pending motions – while awaiting Petitioner's arrival.  (*Id.* at 6).  The parties then entered a stipulation that the Government would not bring up Plaintiff's flight at trial unless the defense first questioned McCombs's flight and opened the door.  (*Id.* at 7-9).  The parties then discussed voir dire and several defense motions prior to holding a suppression hearing, with Petitioner arriving prior to the onset of the suppression hearing.  (*Id.* at 9-43).  The Court then conducted the suppression hearing with Petitioner being present, with the Court ultimately ruling that his statement to customs officials was admissible.  (*Id.* at 43-69).  After the hearing, counsel

13

discussed with Petitioner the decision to waive his presence for the non-testimonial portion of the day's proceedings, and Petitioner agreed to retroactively waive his presence for those discussions. (*Id*. at 70-71).

Petitioner's trial thereafter occurred on April 23 and 24, 2009.  At trial, both LaRoche and McCombs testified at length as to their involvement in the conspiracy outlined in the Third Circuit's factual summary presented above, as well as to Petitioner's role as the lynchpin of that conspiracy to bring cocaine into the United States from Trinidad.  As part of his testimony, McCombs testified that Petitioner's cocaine supplier in Trinidad was named Trini.  (Document 15 attached to ECF No. 34 at 59-60).  McCombs testified that Petitioner called Trini by telephone in his presence.  (*Id.* at 67).  McCombs also testified that Petitioner had multiple cell phones, some he used for personal activity and others for his drug importation operations.  (*Id.* at 71).  McCombs also had several phones, one of which contained a phone number associated with Trini.  (*Id.* at 71-72).  McCombs then identified one of Petitioner's phones, and, using the call log, saw that Petitioner received two calls from the number associated with Trini.  (*Id.* at 75).  Petitioner's phone also contained an outgoing call Petitioner apparently made to Trini's number on the day McCombs and LaRoche travelled to Trinidad.  (*Id.* at 76).  McCombs also testified that he and Petitioner met with Trini and his associates in Trinidad after Petitioner arrived, and again when Trini brought the cocaine to their hotel room.  (*Id.* at 99-103).

On cross-examination, Liebesman confronted McCombs regarding the phone testimony. McCombs reiterated that Petitioner had several phones.  (*Id.* at 138-39).  Liebesman thereafter cross-examined him as to what he told federal agents regarding the phone.  McCombs responded, telling her that he never told agents Petitioner's cell phone number, nor gave them the number to a certain prepaid phone Petitioner apparently used to call Trinidad.  (*Id.* at 153-54).  McCombs

14

admitted, however, that he had had frequent phone contact with Trinidad prior to the drug-smuggling trip.  (*Id.* at 154-55).  McCombs further testified that Petitioner also made numerous calls to Trinidad, albeit on a cellphone other than his main cell phone.  (*Id.* at 159).

Prior to summations, Petitioner called as a rebuttal witness Agent Thomas Sharpe of Immigrations and Customs Enforcement.  (Document 18 attached to ECF No. 34 at 46).  Agent Sharpe testified that although one of the phones in the Government's possession was a phone McCombs had purchased in Trinidad, the Government had been unable to identify the phone number for that phone.  (*Id.*).  Agent Sharpe further testified on cross examination that the Government did not have the power to subpoena phone records from abroad, and that the phone in question was a prepaid phone from Trinidad.  (*Id.* at 54).  Finally, Agent Sharpe testified that Petitioner had not made calls to Trinidad from his mother's phone, and from at least some of his cell phones.  (*Id.* at 51).  Following this testimony, the trial entered its final phase including both summations and the jury instructions.

During her summation, Ms. Liebesman directly attacked McCombs's testimony regarding the cell phones at issue in the case, arguing that Trini was in fact McCombs, with the name referring to a phone McCombs purchased for use in Trinidad.  Specifically, counsel argued as follows:

> Now, Ezra tells you this great story about how [Petitioner]'s telephone was used to call Trinidad.  Not the one that he had, the 404 number he had during the time of the events. Not the one he used to call Charisse LaRoche.  Not the one he used as a contact. No, it must have been a different phone, one that the government, you know, didn't introduce into evidence.
>
> . . . .
>
> []The government knows -- knew all about those other phones.  All about them. Agent Sharpe got on the witness stand and he told you, yes, they were aware of all four phone numbers that

15

were associated with [Petitioner].  And what was Agent Sharpe's job?  To interview witnesses, to follow up, to obtain records.  And on direct he said: Yeah, I believe I got those records for all the phones.   And he didn't remember seeing anything about a connection to Trinidad on any of those phones. On cross: oh, I don't think I got those.  Okay.  You check the records, you check the transcripts.  What did he say on direct?  What did he say on direct?  There was no evidence that he remembered that [Petitioner]'s other phones were in service at the time or -- except for his mother's landline, of course, or they had any records that connected them to Trinidad.

Now, the government has neglected to get any of these records.  Any of these records.  And don't believe for one second that these capable, dedicated people ignored three phone numbers and the possibility of additional evidence. They didn't.  There just wasn't any evidence there so it's not here.  It wasn't there, so it's not here.  It's not: if it doesn't fit, you must acquit; but I'm trying.  Okay.

Now, you have Ezra's cell phone records.  Ezra's cell phone records show that he couldn't stop calling Trinidad.  And, yeah, most of those calls were to one number, but not all of them.  Not all of them.  What records did you get?  You got the ones for the cell phone that [Petitioner] had when he was arrested.  The one with the two phone calls from someone called Trini on May 3rd, 2007.  And Trini is T-R-I-N-I, according to Mr. McCombs, it's not T-R-I-N-N-Y.

Now, you can't speculate -- let me take this back.  Let's talk about Trini.  What are the phone records for -- why do the phone records for Ezra McCombs and [Petitioner] begin on April 15th, and Charisse's cell phone records begin on April 30th?  Perhaps between the 15th and the 30th you would have seen those calls between Ezra and Charisse.

Ezra testified that he called [Petitioner] when he arrived in Trinidad. Now, why would he call [Petitioner] from Trinidad?  He wanted to let them know they arrived on time. It doesn't really matter why he called.  The fact is that he called.  He called with his cell phone, if I may, his international cell phone, the one he got because he couldn't call the United States on his other cell phone, so he got this cell phone, the one with the 868 number, and he called [Petitioner] from Trinidad to let him know they'd arrived.  And you'll have those records and [Petitioner]'s records showing calls from Trinidad at 4:10 and 6:09 eastern standard time, the calls Ezra says were from Trini, the ones that he says were made while he was in the air.

16

Look at the flight records.  Ezra's flight landed at 2 p.m. Please don't tell me that he wasn't the one making those calls at 4:10 and 6:09, and those are the only calls to [Petitioner].  Those are the only ones. The government says [Petitioner]'s phone says calls to Dean and Trini during the time period of Ezra's two trips to Trinidad. You will not find a single call to Trinidad on [Petitioner]'s phone records, except for the two from Trini.

Ladies and gentlemen, I'd like you to meet Trini, the phone that called [Petitioner] from Trinidad after Ezra McCombs landed. And by the way, there's no calls to Trini or from Trini on this.  You know why?  What is he going to do, call himself? Hi, how are you? I'm fine. This is Trini.

In fact, what it comes right down to is there is no Trini.  Trini is the notation in [Petitioner]'s phone directory for Trinidad. Ezra McCombs's Trinidad phone.  Trini, the whole story, is a fabrication. There is no Trini.  There's no big guy with dreads. Trini, right here, a phone that called [Petitioner] on the 3rd.

Now, only the last 10 outgoing calls are shown on this phone and the last, the most, the furthest in time, I'm stumbling on here, folks, was on 5/5/07. So that was after [Petitioner]'s -- the calls to [Petitioner] were made.  So, I'm sorry, we can't prove it from this. And of course the incoming calls they don't show because, as you saw from [Petitioner]'s records, it was a zero-minute call and zero-minute calls don't show on the receiving end.  But we know, without any shadow of a doubt, that this was the phone that called [Petitioner].  And that, ladies and gentlemen, is more reasonable doubt than you will ever need in this case to acquit this man who has been, he's been somebody's scapegoat for two years he's been fighting this case. He didn't plead guilty because he's not guilty. They pled guilty because they are. Ladies and gentlemen, this is Trini, the guy with the dreadlocks.  The phone call to [Petitioner] was made by Ezra McCombs.

Once you realize that Trini was Ezra's cell phone, you have to realize that everything Ezra told you is a lie.  There are no meetings with the drug dealer named Trini, T-R-I-N-I, like it's in the phone, unless Ezra was talking to himself. This whole thing is a lie. It's a lie. And you cannot convict this man on the basis of these liars.

(Document 18 attached to ECF No. 14 at 113-17).

Despite counsel's arguments, the jury ultimately convicted Petitioner of both of the remaining drug charges after a short period of deliberations. *See St. Vallier*, 404 F. App'x at 654. Following the verdict, Petitioner filed a motion for a new trial arguing, *inter alia*, that McCombs had perjured himself in stating that he had not provided the Government with Petitioner's phone number which Petitioner contends was contrary to Agent Sharpe's warrant application, and that the phone referred to as belonging to Trini at trial actually belonged to McCombs and that the Government knew or should have known about this fact. (*See* Docket No. 07-613 at ECF Nos. 109-11). This Court rejected those and all of Petitioner's arguments during a hearing held on July 8, 2009. (Docket No. 07-613 at ECF No. 116).[2]

Following the denial of Petitioner's first motion for a new trial, this Court sentenced Petitioner to a total of 204 months incarceration. *St. Vallier*, 404 F. App'x at 654. Petitioner appealed, and the Third Circuit affirmed his conviction, but remanded the matter for a resentencing based on a procedural error in calculating Petitioner's criminal history category. *Id.* at 665. Petitioner also petitioned for certiorari, but certiorari was denied on May 16, 2011. *St. Vallier*, 563 U.S. at 1000. This Court thereafter resentenced Petitioner, ultimately departing upward to once again sentence Petitioner to 204 months imprisonment. Petitioner appealed once again, and the Third Circuit affirmed his resentencing. *St. Vallier*, 488 F. App'x at 632-34. Petitioner again filed a petition for certiorari, which the Supreme Court denied. *St. Vallier*, 133 S. Ct. at 368.

---

[2] Petitioner also tried to raise his perjury claim on direct appeal. *See St. Vallier*, 404 F. App'x at 659-60. The Third Circuit found that claim to be without merit, noting that McCombs's response to counsel's question did not necessarily conflict with the warrant application as that application never stated that McCombs gave investigators Petitioner's phone number, and that in any event the inexact nature of the question in the face of the fact that there were multiple cell phones attributed to Petitioner in this matter likely caused any confusion or disparity between the warrant and McCombs's response. *Id.*

18

On July 6, 2011, the Government disclosed to Petitioner and his appellate counsel information that they had received regarding a proffer session in the prosecution of an individual named Shawn Hudson.  *See United States v. St. Vallier*, No. 07-613, 2013 WL 5937006, at *1-3 (D.N.J. Oct. 31, 2013).  According to the letter, during a July 27, 2010, proffer session with the United States Attorney's Office for the Eastern District of New York, Hudson made statements asserting that he and McCombs had previously smuggled drugs into the United States from abroad. *Id.* at *2.  The Government further stated in the letter that they had become aware of this proffer on June 29, 2011, when their lead investigator had discovered it.  *Id.*  The letter further stated that Hudson had been known to the Government prior to trial only in so much as his name had come up both as someone with whom McCombs had traveled to Jamaica and as an individual whom McCombs tried to contact while he was a fugitive.  *Id.* at *3.  Based on this information, Petitioner filed a second motion for a new trial in May 2012 in which he argued, *inter alia*, that he had been denied *Brady* material in the form of the Hudson information during and prior to trial.  *Id.* at *1. This Court ultimately denied that motion on October 31, 2013, finding that the challenged material did not constitute *Brady* or *Giglio* material as the Government had not possessed the information during trial, and the information was at any rate not material.  *Id.* at *4-5.  Petitioner failed to timely appeal the denial of that motion, but eventually filed a motion to re-open the time to appeal in February 2014, which this Court denied.  *United States v. St. Vallier*, No. 07-613, 2014 WL 5308150 (D.N.J. Oct. 15, 2014), *aff'd*, 607 F. App'x 129 (3d Cir. 2015).

Petitioner filed his initial motion to vacate sentence in this matter on or about September 26, 2013.  (ECF No. 1 at 13).  Following this Court's *Miller* order (ECF No. 4), Petitioner filed an amended motion to vacate sentence containing more developed versions of the claims presented in his initial motion to vacate sentence in February 2014.  (ECF No. 6).  The Government was

thereafter ordered to answer the motion, with the time for an answer being extended until after Petitioner's motion to reopen his time to appeal his Rule 33 motion had been decided. (ECF No. 7, 9, ECF Docket Sheet). Prior to the filing of the answer, Petitioner filed a motion for leave to file a supplemental motion to vacate sentence raising two additional claims in January 2015. (ECF No. 21). Petitioner filed his proposed supplemental motion on or about March 11, 2015. (ECF No. 22). Because the Government did not oppose the motion, this Court granted Petitioner's motion for leave to file a supplemental motion, and permitted the Government an extension of time to file a response to both the amended motion to vacate and the supplemental motion on March 25, 2015. (ECF No. 24). In that Order, however, this Court made no ruling on the timeliness or propriety of Petitioner's supplemental motion or the claims contained within the supplement. (*Id.*). The Government ultimately filed its response on September 11, 2015. (ECF No. 34). Petitioner thereafter filed his reply brief on or about November 30, 2015. (ECF No. 38). Alongside his reply, Petitioner also filed in November 2015 a motion for discovery. (*Id.*). The Government opposed that motion (ECF No. 41), and Petitioner has filed a reply to that opposition. (ECF No. 42).


## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255.  Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## B.  Analysis

### 1.  An evidentiary hearing is not required

A district court need not hold an evidentary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992).  "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required."  *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *see also Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546.  For the reasons set forth below, all of Petitioner's claims are either time barred or are clearly without merit based on the record before this Court, and no evidentiary hearing is therefore required to dispose of his motion to vacate.

**2. Petitioner's Motion for Discovery**

Before reaching the merits of Petitioner's claims, this Court must first address Petitioner's motion for discovery.  In his motion, Petitioner seeks to have this Court order the Government to provide him with significant information regarding the prosecution of Petitioner's first defense counsel, Paul Bergrin, including wiretaps and surveillance videos, records of visits Bergrin made to another client named "Esteves," and the charging documents in the Government's case against Bergrin.  In support of this request, Petitioner asserts that he "believes that if the facts are fully developed" he "will be entitled to relief."  (ECF No. 38 at 112).  Specifically, Petitioner contends that if he is permitted to engage in discovery, he can more fully make out his claim that Bergrin was fatally conflicted and that that conflict of interest denied him effective assistance of counsel.

Under the habeas rules, the Court in a § 2255 motion may "for good cause" authorize a party to conduct discovery.  Rule 6 of the Rules Governing Section 2255 Proceedings.  Thus, in order to be entitled to discovery, a habeas petitioner must make a "showing of good cause." *Williams v. Beard*, 637 F.3d 195, 209 (3d Cir. 2011) (interpreting analogue rule for habeas petitions challenging state court convictions).  A habeas petitioner satisfies this standard "by setting forth specific factual allegations which, if fully developed, would entitle him or her" to habeas relief. *Id.*  "The burden rests upon the petitioner to demonstrate that the sought-after information is pertinent and that there is good cause for its production." *Id.*  The rule does not permit habeas petitioners to engage in fishing expeditions, and discovery requests providing no more than speculation should be rejected. *Id.* at 210-11.

Here, Petitioner requests various documents related to his representation by Paul Bergrin in order to show that there was a conflict of interest between Bergrin and himself.  Petitioner does little to explain how the documents in question will aid him in making his claim as the documents

he requests essentially boil down to the factual basis for Bergrin's eventual conviction for various federal charges after he had already withdrawn as Petitioner's counsel.   Ultimately, the Government in this matter essentially concedes that Bergrin possessed a conflict of interest.   The point in contention here, as is discussed below, is instead whether Petitioner waived that conflict of interest.   As such, even if the documents Petitioner requests, many of which are available via Bergrin's criminal docket sheet, would show the conflict that all parties concede existed, they would not themselves entitle Petitioner to relief given the waiver of the conflict of interest Petitioner made in this matter.   As such, Petitioner has not shown that the documents in question would entitle him to relief.   As this Court will explain below, Petitioner's knowing and intelligent waiver of the conflict of interest arising out of Bergrin's criminal charges prevents him from raising his claim that this conflict denied him effective assistance of counsel in this matter, and as such, Petitioner is not entitled to relief on this claim.   Because Petitioner's conflict claim is the only one for which he requests discovery, and because discovery will not aid Petitioner in showing his entitlement to relief on that claim, Petitioner has failed to show good cause for permitting him to engage in discovery.   Petitioner's discovery request shall therefore be denied.   *Beard*, 637 F.3d at 209-11.

**3.  Petitioner's Supplemental Claims are time barred**

More than a year after Petitioner filed his amended motion to vacate, which Petitioner stated was his "all-inclusive" § 2255 motion, Petitioner sought to file in this matter a supplemental brief raising additional claims.  (ECF Nos. 6, 22).  Because the Government did not oppose the motion and instead stated its intention to respond to the claims contained therein, this Court permitted Petitioner to file that brief.  (*See* ECF No. 30).   Although Petitioner was granted

permission to file his brief, this Court never ruled on the timeliness or propriety of Petitioner's supplement.  The Government therefore now argues that the claims contained therein should be dismissed with prejudice as time barred because Petitioner could have, but did not, raise the claims contained therein sooner, specifically in either his initial motion to vacate or his amended motion.

Collateral attacks brought via motions to vacate sentence under § 2255 are subject to a one year statute of limitations.  *See* 28 U.S.C. § 2255(f).  That limitations period runs from the latest of the following: the date on which the conviction in question became final, the date when an impediment to bringing the claim was removed, the date on which the right was first recognized by the Supreme Court where the claim is based on a new theory recently made retroactive on collateral review by the Supreme Court, or the date on which the facts supporting the claim could first have been discovered through reasonable diligence.  28 U.S.C. § 2255(f)(1)-(4).  Where the statute runs from the date on which a conviction became final, the conviction is considered final when either the Petitioner's final appeal is denied by the Supreme Court or when the time for filing an appeal, including a petition for certiorari, runs without such a petition being filed.  *See, e.g.,* *Kapral v. United States*, 166 F. 3d 565, 577 (3d Cir. 1999).

In this case, Petitioner was sentenced in August 2009.  He appealed, and the Third Circuit remanded his case for resentencing only in 2010.  *St. Vallier*, 404 F. App'x at 665.  This Court resentenced Petitioner in April 2011, and Petitioner appealed once again, with the Third Circuit affirming his resentencing on July 17, 2012.  *St. Vallier*, 488 F. App'x at 634.  Petitioner filed a petition for certiorari, which was denied on October 1, 2012.  *St. Vallier*, 133 S. Ct. at 368.  Petitioner's conviction thus became final on October 1, 2012, when his petition for certiorari was denied.  Petitioner's one year statute of limitations, then, would have run as of October 1, 2013, absent some form of equitable tolling.

24

To the extent that the claims in Petitioner's supplemental motion are based on allegedly "newly discovered" evidence, those claims would not provide Petitioner with a later start date for the statute of limitations. The allegedly new evidence on which his claims are based is the alleged *Brady* violation and related ineffective assistance arising out of the revelation that a third party had identified one of the Government's witnesses as a drug dealer, which was revealed to Petitioner in 2011 and was the subject of his June 2012 motion for a new trial. Thus, Petitioner clearly knew about the factual basis for those claims when he filed his June 2012 motion at the latest. Because the facts underlying those claims were discoverable through reasonable diligence prior to the October 2012 date on which his conviction became final, Petitioner's limitations period runs from the date on which his conviction became final. 28 U.S.C. § 2255(f)(1)-(4).

Given this background, and absent any equitable tolling, Petitioner's one year statute of limitations would have run by October 1, 2013. Based on the date he signed his initial § 2255 motion, Petitioner filed his original motion to vacate on September 26, 2013. (ECF No. 1 at 13). Because all of the claims raised in Plaintiff's first amended motion to vacate were raised in that initial motion to vacate sentence, it is clear that Petitioner's four claims contained in his amended motion to vacate sentence were timely raised, and his amendments thereto merely refined, rather than changed those claims. Petitioner's claims that Bergrin and Liebesman were ineffective were thus timely raised, and will be addressed on the merits below.

Petitioner's *Brady* and ineffective assistance claims raised in his March 2015 supplemental motion, however, do not fare as well. Those claims were not included in Petitioner's original motion, nor his amended motion to vacate which Petitioner specifically stated was his one, all-inclusive § 2255 motion. Those claims were raised before this Court for the first time when Petitioner filed his supplemental motion on March 11, 2015, more than seventeen months after the

statute of limitations had run. Because those claims were not raised until after the running of the statute of limitations, they would only be timely filed if either those claims related back to Petitioner's original motion to vacate under Federal Rule of Civil Procedure 15(c), *see Mayle v. Felix*, 545 U.S. 644 (2005), or Petitioner presented a valid basis for tolling those seventeen intervening months.

Pursuant to Federal Rule of Civil Procedure 15(c)(2), claims raised in an amended or supplemental habeas petition will only relate back to the original filing where the newly raised claims "ar[i]se out of the [same] conduct, transaction, or occurrence" as those raised in the original pleading. *Mayle*, 545 U.S. at 655-64. Thus, a newly raised claim will relate back only when it and at least one of the claims raised in the original pleading are "tied to a common core of operative facts." *Id.* at 664. The newly raised claims must therefore not be "separate in both time and type" from the originally raised claims in order for relation back to be in order. *Id.* at 657. It is therefore not enough that the claims in question raise the same type of claim, such as ineffective assistance of counsel, they must actually arise out of the same set of facts or occurrences. *See, e.g., United States v. Duffus*, 174 F.3d 333, 337 (3d Cir. 1999).

In this case, Petitioner's supplemental claims do not relate back to his original pleading. In his supplemental motion, Petitioner attempts to raise two new claims – that the Government failed to provide him with *Brady* or *Giglio* material by failing to disclose that a witness known to another United States Attorney's office had identified McCombs as a drug dealer with whom he had travelled, and that Petitioner's appellate counsel was constitutionally ineffective for failing to investigate the lead presented in this alleged *Brady* violation. Neither claim in any way deals with the alleged ineffectiveness of Petitioner's other prior attorneys, Bergrin and Liebesman. Neither claim concerns the time during which those attorneys represented Petitioner, through his 2009

26

sentencing.  Instead, Petitioner's supplemental claims arose years after Bergrin and Liebesman had

left this case – following the 2011 disclosure of the alleged *Brady/Giglio* material.  Thus, regardless

of the fact that one of the two new claims raises the same kind of claim as Petitioner's originally

pled claims – ineffective assistance of counsel – it is clear that Petitioner's new claims are separate

in time from his original claims, and clearly do not arise out of a common core of operative facts.

As such, those claims do not relate back to Petitioner's original claims, and are not timely filed on

that basis.  *Duffus*, 174 F.3d at 337; *see also Mayle*, 545 U.S. at 655-64.

Because his new claims do not relate back, those claims are untimely absent some basis for

equitable tolling.  The § 2255 statute of limitations is subject to equitable tolling where appropriate.

Equitable tolling "is a remedy which should be invoked 'only sparingly.'"  *United States v. Bass*,

268 F. App'x 196, 199 (3d Cir. 2008) (quoting *United States v. Midgley*, 142 F.3d 174, 179 (3d

Cir. 1998)).  In order to receive the benefit of tolling, a petitioner must "show (1) that he faced

'extraordinary circumstances that stood in the way of timely filing,' and (2) that he exercised

reasonable diligence."  *Johnson*, 590 F. App'x at 179 (quoting *Pabon v. Mahanoy*, 654 F.3d 385,

399 (3d Cir. 2011)).  Mere excusable neglect is insufficient to warrant tolling of the limitations

period.  *United States v. Thomas*, 713 F.3d 165, 174 (3d Cir. 2013).

The only potential basis Petitioner provides for equitable tolling in this matter is his

assertion that he could not have brought the claims presented in his supplemental motion prior to

the conclusion of his Rule 33 motion proceedings.  This statement, however, is inaccurate.

Nothing prevented Petitioner from raising those claims in his initial motion, and, as discussed

above, the fact that Petitioner raised those claims via Rule 33 in June 2012 clearly indicates that

he was aware of his claims by that date at the absolute latest.  Thus, Petitioner was aware of the

basis for his claims prior to filing his initial petition and chose not to raise them there.  That

Petitioner chose to raise his claim only via his rule 33 motion and not in his § 2255 motion was a choice Petitioner himself made.  That choice is insufficient to show that he faced any extraordinary circumstances that prevented him from earlier filing his *Brady* claim.  Thus, Petitioner has failed to present any valid basis for equitable tolling, and the claims raised in his supplemental motion will be dismissed with prejudice as time-barred.

In any event, even if Petitioner had raised these claims in a timely fashion, his claims would be without merit for the reasons discussed in this Court's opinion denying his Rule 33 motion.  *See St. Vallier*, 2013 WL 5937006, at *3-*5.   As explained in that opinion, the material in question was not *Brady* or *Giglio* material because it was not in the Government's possession prior to the conclusion of Petitioner's trial nor was it material.  As such, Petitioner's *Brady* claim would be without merit, even if it were not time barred.  Petitioner's claim that appellate counsel was ineffective in failing to pursue further investigation as to that alleged *Brady* material likewise is insufficient to state a claim for relief as Petitioner has provided no allegations as to what additional information would have been uncovered by any additional investigation, which is fatal to his ability to show *Strickland* prejudice.  *See Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).  That the material in question was clearly not *Brady* or *Giglio* material for the reasons expressed in this Court's denial of the Rule 33 motion likewise indicates that Petitioner could not have shown prejudice in any event as the outcome of the Rule 33 motion, and in turn Petitioner's prosecution, would not have been different had counsel investigated Petitioner's *Brady*/*Giglio* claim to Petitioner's satisfaction.  Thus, even if Petitioner's claims were not time-barred, they would afford him no basis for habeas relief.

**4.  Petitioner's Ineffective Assistance of Counsel Claims**

All of Petitioner's remaining claims assert that his pre-trial counsel, Paul Bergrin, and trial counsel, Ruth Liebesman, were constitutionally ineffective.  The standard governing such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*  The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.*  In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.  Where a

> "petition contains no factual matter regarding *Strickland's* prejudice
> prong, and [only provides] . . . unadorned legal conclusion[s] . . .
> without supporting factual allegations," that petition is insufficient
> to warrant an evidentiary hearing, and the petitioner has not shown
> his entitlement to habeas relief.  *See Palmer v. Hendricks*, 592 F.3d
> 386, 395 (3d Cir. 2010).  "Because failure to satisfy either prong
> defeats an ineffective assistance claim, and because it is preferable
> to avoid passing judgment on counsel's performance when possible,
> [*Strickland*, 466 U.S. at 697-98]," courts should address the
> prejudice prong first where it is dispositive of a petitioner's claims.
> *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge*, 119 F. Supp. 3d at 280-81.  In his amended habeas petition, Petitioner presents four claims, each of which this Court will address in turn: that Paul Bergrin was constitutionally ineffective because of the conflict of interest created by the criminal charges against him, that Bergrin was ineffective in advising Petitioner regarding a proposed plea agreement, that trial Counsel Ruth Liebesman was ineffective in failing to investigate telephone evidence presented at trial, and that Liebesman was ineffective in failing to fully investigate his prior convictions prior to sentencing.

### a.  Petitioner's Conflict of Interest Claim as to Bergrin

In his first claim, Petitioner asserts that his first attorney, Paul Bergrin, was constitutionally ineffective as counsel because he had an actual conflict of interest with Petitioner as he was subject to extensive criminal charges at the time of his representation.  The central problem with Petitioner's argument, however, is that Petitioner himself waived any such conflict of interest claim during the pre-trial stage of his criminal prosecution.  While the "Sixth Amendment guarantees a criminal defendant counsel's 'undivided loyalty free of conflict of interest,'" *see Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998) (quoting *Government of V.I. v. Zepp*, 748 F.2d 125 (3d Cir 1984)), a criminal defendant is free to voluntarily waive his right to "assistance of an attorney unhindered by a conflict of interests."  *Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5

(1978).  Thus, where a criminal defendant has "made a knowing and intelligent waiver" of his right to conflict-free counsel, he "cannot subsequently attack his conviction premised on the assertion of a conflict."  *Rutherford v. Hendricks*, No. 02-3131, 2005 WL 1541063, at *14-15 (D.N.J. June 30, 2005); *see also United States v. Dolan*, 570 F.2d 1177, 1181 (3d Cir. 1978) ; *United States v. Krebs*, 788 F.2d 1166, 1173 (6th Cir. 1986); *United States v Sims*, 143 F. App'x 210, 217 (11th Cir. 2005); *Darby v. United States*, No. 10-1437, 2010 WL 4387511, at *8 (D.N.J. Oct. 28, 2010) (by "waiving his right to conflict-free representation, Petitioner also waived any ineffective assistance claims stemming from his attorney's conflict of interest [including any claim] that his attorney may [have been] too preoccupied with his own legal troubles to make himself available to Petitioner").

In this case, Petitioner made a knowing and intelligent waiver of his right to conflict free counsel.  When Bergrin's New York state criminal charges and potential for federal charges was brought to the Court's attention by the Government, a conflict hearing was held in this matter at which Petitioner acknowledged the conflict, and chose to continue with Bergrin as his lawyer. Petitioner was thereafter appointed a conflicts counsel, who further advised Petitioner as to the nature of the conflict.  At the follow-up conflict hearing, Petitioner once again reiterated his desire to keep Bergrin as his lawyer, and acknowledged that he had been fully advised as to the nature of the potential conflicts, including that Bergrin could be distracted by his own charges or may wish to curry favor with the government, and that he wished to waive his right to conflict-free counsel after a full discussion of the matter with his conflicts counsel.  It is thus clear from the record that, after having discussed the matter fully and to his complete satisfaction with conflicts counsel, Petitioner knowingly and voluntarily chose to continue on with Bergrin despite the potential conflict of interest brewing in the form of known state and potential federal criminal charges

against Bergrin.  Indeed, after Petitioner's flight and bail jumping, another hearing was held at which Petitioner reiterated his satisfaction with and desire to continue to retain Bergrin.  Given these facts, it is clear that Petitioner made a knowing and voluntary waiver of his right to conflict free counsel, and as such cannot raise the challenge he seeks to make here.

Petitioner attempts in his papers to argue that his waiver was not knowing because he was unaware of the extent of Bergrin's criminal activities.  The problem with that argument, of course, is that Petitioner need not know the extent of his attorney's criminal actions to waive his rights, he need only know of and choose to waive the conflict of interest.  Regardless of the severity of Bergrin's crimes, Petitioner was made aware of the conflicts of interest at stake here – Bergrin's potential distraction and possible desire to curry favor with the Government – and chose to waive those after consultation with conflicts counsel.  As such, that Petitioner did not know the extent of Bergrin's criminal actions is immaterial.  Petitioner knowingly and voluntarily waived his right to conflict free counsel, and as such cannot now raise an ineffective assistance claim based on counsel having been conflicted.  *Rutherford*, 2005 WL 1541063 at *14-15; *see also Dolan*, 570 F.2d at 1181; *Krebs*, 788 F.2d at 1173; *Sims*, 143 F. App'x at 217; *Darby*, 2010 WL 4387511 at *8.


**b.  Petitioner's Plea Claim as to Bergrin**

Petitioner next asserts that Paul Bergrin was ineffective in advising him regarding a plea offer made by the Government in July 2008.  Specifically, Petitioner alleges that Bergrin gave him insufficient information about the strengths of the Government's case to enable him to properly weigh his options, and that he ultimately rejected the plea because he felt that Bergrin's advice to take the plea was "incoherent" in light of Petitioner's perceptions regarding the evidence.  When advising his client as to a plea deal, counsel is required to provide a criminal defendant with

sufficient information "to make a reasonable informed decision whether to accept a plea offer." *United State v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015) (quoting *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013)). Even where a petitioner can show that his attorney failed to do so, he must still show that he was prejudiced by counsel's failure by showing that "but for his counsel's advice, he would have accepted the plea and that [the plea] agreement would have result[ed] in a lesser sentence." *Rickard v. United States*, No. 10-4089, 2011 WL 3610413, at *8 (D.N.J. Aug. 16, 2011); *accord Lafler v. Cooper*, --- U.S. ---, ---, 132 S. Ct. 1376, 1384-85 (2012) (prejudice in this context requires a petition to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [which i]n the context of pleas [requires] a [petitioner] show the outcome of the plea process would have been different with competent advice"). Thus, to establish prejudice based on counsel's failure to properly advise Petitioner as to a plea, Petitioner must show that he would have accepted the deal had he been given proper advice, that the deal would not have been withdrawn, that the Court would have accepted the deal, and that a lesser sentence would have resulted from the accepted plea. *Lafler*, 132 S. Ct. at 1385.

Even assuming that Bergrin was deficient in advising Petitioner regarding the offered plea deal, Petitioner cannot show that he was prejudiced by the advice he was given in this matter because he has not shown that, had he received adequate advice, he would have accepted the plea in question. In his amended motion to vacate, Petitioner states only that he "romanced the possibility of taking a plea" at the time the plea was offered. (ECF No. 6 at 49). In his attached affidavit,[3] Petitioner in turn states that he "considered pleading guilty." (*Id.* at 66). Petitioner

---

[3] The Court notes that Petitioner did not sign this affidavit, and therefore did not attest to its truthfulness. (*See* ECF No. 6 at 69).

further alleges in his affidavit that Bergrin told him that there was significant evidence of his guilt, including that there was evidence that Petitioner had checked luggage containing drugs, that he paid for the trips of both of his co-conspirators, and that Petitioner had made multiple trips to Trinidad.  (*Id.*).  Petitioner then states that Bergrin told him that he should plead guilty because, based on the Government's evidence, Petitioner had "zero chance of winning.  Not one percent, not two percent.  Zero percent."  (*Id.* at 67).  Even given such a grim estimate of his chances, however, Petitioner states that he rejected the plea deal and wished to proceed to trial.  Petitioner places the blame for this decision on Bergrin, stating that Bergrin inadequately advised him as to the strength of the Government's case.  (*Id.* at 49-50).

In his reply brief, Petitioner reiterates that he "considered pleading guilty" and "romanced the possibility of taking a plea" but was unwilling absent more information on the strength of the Government's case.  Although Petitioner states that he was open to a potential plea, he does not state in any certain terms that he was willing to take the plea offered to him in July 2008.  The only evidence for any willingness to accept that plea Petitioner offers is a statement made by Bergrin during the July 21, 2008 hearing that he had convinced Petitioner that pleading was in his best interest.  (ECF No. 38 at 9).  Of course, that same hearing is the one from which Petitioner fled, resulting in a warrant for his arrest and Petitioner's eventual conviction for fleeing prosecution, and Petitioner in his amended motion specifically states that Bergrin's "incoherence" at that time prevented him from being willing to accept that plea.

Ultimately, Petitioner's motion states that Petitioner was not wholly opposed to the idea of a plea, but contains no information suggesting that Petitioner had any interest in accepting the one plea offer to which he points, the July 2008 proposed plea.  As to that proposal, Petitioner specifically states that, even after his attorney told him that the Government possessed damning

34

evidence, including the checked baggage and the fact that Petitioner had paid for his co-defendants' trip to Trinidad to purchase drugs, and after counsel told Petitioner that he had "zero chance" of winning at trial, Petitioner rejected the offered plea, desiring more information about the strength of the Government's case. Thus, this is not a case where counsel suggested rejecting a plea, resulting in his client losing the benefit of an offered deal, but rather a case where counsel strongly implored his client to take the beneficial plea deal in light of strong evidence of guilt, and Petitioner rejected it because he did not like counsel's entirely accurate estimation of his chances at trial. Given that Petitioner insisted on his innocence throughout his original sentencing and appeal and only attempted to accept his guilt prior to his resentencing, these facts are not surprising. Petitioner has not stated that he had any interest in taking the deal that was offered in July 2008, and has effectively told the court that he rejected that deal even after being told that it was his best option because he felt he had not had enough information on the strength of the Government's case. Thus, Petitioner has negated his ability to show that he suffered any prejudice as a result of Bergrin's alleged deficient performance. Petitioner's theoretical openness to the concept of pleading is insufficient, to show prejudice Petitioner must show that, but for counsel's actions, he would have pled guilty. Petitioner's pleadings show exactly the opposite – even in the face of strong evidence of guilt and counsel's advice that Petitioner had no chance at trial, Petitioner rejected the deal for lack of information about the strength of the Government's case. Petitioner has failed to establish *Strickland* prejudice as a result, and his ineffective assistance claim must fail. *Lafler*, 132 S. Ct. at 1385.

### c.  Petitioner's Pre-trial Investigation Claim as to Liebesman

Petitioner's central claim as to his actual trial counsel, Ruth Liebesman, is that she inadequately investigated the factual background of his case, and thus failed to challenge phone records submitted during his trial.  As this Court has recently explained,

> [i]n *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691.  "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness."  *United States v. Travillion*, 759 F.3d 281, 293 n. 23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).

> Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice.  In order to do so,

>> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result.

> *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity

36

what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown*, 2016 WL 1732377at *4-5.

In this claim, Petitioner essentially argues that had Ms. Liebesman more thoroughly investigated the cellular telephone evidence used at trial she could have more capably advised him as to whether or not to plead guilty, and she could have more ably attacked the credibility of McCombs. As to the first part of this claim, that counsel could have more ably advised Petitioner as to pleading guilty, that claim would fail for similar reasons to those discussed in reference to Paul Bergrin above, Petitioner has not identified a specific plea agreement to which he would have agreed to plead guilty, nor does he state in reference to Liebesman that he would have pled guilty during her period of representation, both of which are fatal to any attempt to show prejudice as to his decision to proceed to trial. *See Lafler*, 132 S. Ct. at 1385. Indeed, because Petitioner presents little more than a bare allegation as to any alleged advice regarding guilty pleas on the drug charges during Liebesman's representation, Petitioner's assertion is utterly incapable of establishing a basis for relief. *See Palmer*, 592 F.3d at 395.

Turning to Petitioner's central investigation claim, Petitioner asserts that Liebesman was ineffective insomuch as she did not fully investigate the cellular telephone evidence presented at trial to his satisfaction. Initially, this Court notes that Liebesman's performance throughout her representation at trial was indicative of her preparation and familiarity with the case at hand, and that performance clearly shows that Petitioner's is not a case in which his counsel performed no investigation at all. Thus, the question here is whether Petitioner can show that further investigation would have resulted in evidence which was capable of producing a different result at trial. *Brown*, 2016 WL 1732377, at *4-5.

Even if this Court were to assume for the sake of argument that counsel's alleged failure to investigate rendered her performance deficient, Petitioner cannot show that he was prejudiced by counsel's decision not to further investigate the cellular telephones discussed at trial. Essentially, Petitioner argues that, had counsel more thoroughly investigated the phones, she would have discovered that the phone number McCombs attributed to Trini was, in fact, his own Trinidadian cell phone, and that not only was Trini actually McCombs, but also that McCombs had perjured himself. Nothing in the record supports these assertions,[4] and there is nothing presented which clearly indicates that the number associated with Trini can definitively be attributed to McCombs. These same points were raised, argued, and rejected in the first of Petitioner's motions for a new trial prior to his direct appeal, and to the extent Petitioner alleges McCombs perjured himself, the Third Circuit found that the record does not establish any perjury on the part of McCombs. Putting the perjury issue aside, counsel could and in fact did argue extensively during her summation that McCombs was, in fact, Trini, and that the number attributed to Trini was actually McCombs's international phone. Counsel likewise extensively cross-examined McCombs on the cell phone issues and his part in identifying the various phones. Thus, Petitioner to a great extent received from counsel the very service he now argues should have been provided – that she raise the argument to the jury that McCombs was Trini and that she use the

---

[4] Petitioner, in his post-trial motions, and counsel during her summation have contended that Trini's phone number was actually the number of one of McCombs phones, without ever supplying any actual evidence to show that this was, indeed, the case. During his testimony, Agent Sharpe testified that the Government had been unable to determine the actual phone number for McCombs's prepaid Trinidadian cellular phone, which was in the Government's possession. (*See* Document No. 18 attached to ECF No. 34 at 45-46). Thus, the record does not support the assertion that the Trini phone number was in fact the number for McCombs's Trinidadian cell phone. The only evidence in the record on this issue is McCombs's own testimony, which states that the number in question was Trini's phone number, and not the number of McCombs's Trinidadian phone.

cell phone testimony McCombs provided to do so.  Ultimately, the jury, in convicting Petitioner, found that argument unimportant to a determination of Petitioner's guilt.  Petitioner was thus not prejudiced by the lack of further telephone record investigation by counsel.

Moving beyond the phone issue, the evidence of Petitioner's guilt established at trial can safely be categorized as overwhelming.  During trial, both of Petitioner's co-conspirators testified as to Petitioner's guilt, including his part in aiding and in part paying for their travel arrangements.  Documentary evidence submitted at trial further substantiated Petitioner's part in facilitating LaRoche's travel to and from Trinidad.  The evidence at trial clearly established Petitioner's guilt insomuch as the documents and co-conspirator testimony show that Petitioner conspired with LaRoche and McCombs to bring the drugs into this country from Trinidad, and that the three were caught doing so upon arrival in the United States.  Given the strength of the evidence presented at trial, it is doubtful Petitioner could show that he was in any way prejudiced by counsel's failure to more fully investigate the telephone evidence.  *See, e.g., Saranchak v. Beard*, 616 F.3d 292, 311 (3d Cir. 2010); *see also Copenhafer v. Horn*, 696 F.3d 377, 390 (3d Cir. 2012) ("[i]n light of the overwhelming evidence . . . we agree . . . that [the petitioner] cannot show he was prejudiced").  Here, Petitioner has not shown that, had counsel more fully investigated, the result of his trial would likely have been different, and, given the strong evidence of his guilt, has in turn failed to show that he was prejudiced by that alleged failing.

In his reply brief, Petitioner conflates the telephone records with another argument that counsel raised at the end of trial regarding McCombs allegedly perjuring himself, this time regarding McCombs having stated that the three had separated LaRoche's clothing into the three drug suitcases, rather than LaRoche's into one suitcase and men's clothing into the others which customs records suggest occurred.  Following McCombs's testimony, counsel for Petitioner

39

argued that she had arguably been ineffective in failing to challenge McCombs regarding this alleged "perjury." (*See* Document 18 attached to ECF No. 34 at 8-15). This Court, however, rejected counsel's assertion at that time that she had been ineffective in pointing out this "perjury," observing that McCombs statement could well have been a misstatement, and that the difference between putting LaRoche's clothes in all three suitcases versus putting her clothing in one and McCombs's or another man's clothing in the other two was not significant and was certainly not so stark that it could be accurately called perjury, nor could counsel's failure to challenge him on the point be accurately characterized as ineffective assistance. (*See Id.* at 15-17). Counsel's failure to pursue this non-issue can hardly be said to be deficient performance, and counsel's statement that she felt it constituted ineffective performance was, at best, a combination of hindsight and overt hyperbole, as this Court stated at the time. (*Id.*). In any event, given the strength of the evidence of Petitioner's guilt, and the utter lack of importance that can be attributed to the clothing distinction, it can safely be said that this issue does not amount to a case of ineffective assistance, even were this point not raised in Petitioner's reply brief. Petitioner has thus failed to show that counsel's alleged lack of investigation prejudiced his defense, and has therefore failed to establish ineffective assistance of counsel.

As a final note in regard to Petitioner's assertion that counsel was ineffective pre-trial, Petitioner's complaints regarding counsel waiving his presence during a pre-trial hearing when he was inadvertently not brought to court for a hearing date are without merit as Petitioner cannot show how he was prejudiced by the waiver of his presence. Indeed, the record clearly indicates that, after speaking with counsel, Petitioner himself agreed to retroactively waive his presence. At any rate, even without that waiver, the portion of the hearing in question held prior to Petitioner's arrival, which is discussed above, dealt specifically with questions and legal issues raised by

counsel rather than any testimony, and thus avoided crossing into areas where Petitioner's presence would have been helpful, let alone vital. In the end, Petitioner has provided no basis for concluding that he was prejudiced by the waiver of his presence, let alone more than a conclusory allegation of prejudice, and this claim, too, fails to establish ineffective assistance of counsel. *See Palmer*, 592 F.3d at 395.

### d. Petitioner's Sentencing Claims as to Liebesman

In his final series of ineffective assistance of counsel claims, Petitioner alleges that Liebesman was ineffective during his sentencing proceedings. First, Petitioner alleges that, had Liebesman more thoroughly investigated his criminal history, she could have presented the Court with physical documentation as to the sentence he received for one of his prior convictions, which would have resulted in the Court finding him to have a lesser criminal history category. The inherent problem with this claim, however, is that any prejudice Petitioner may have suffered as a result of counsel being unable to produce documentation regarding his sentence on that prior conviction was essentially eliminated when the Third Circuit vacated his sentence and remanded his case for resentencing in light of the facts Petitioner contends counsel should have raised. *See St. Vallier*, 404 F. App'x at 664-65. On remand, Petitioner's criminal history category was recalculated and Petitioner received the full benefit of the argument that he now argues counsel should have made at his initial sentencing hearing.[5] That he ultimately received the same sentence is immaterial, as he received the benefit of the argument of which he claims he was deprived by

---

[5] It should be noted that Petitioner's counsel did, in fact, raise the argument Petitioner now suggests she should have during his initial sentence, but was at that time unable to produce documentation to prove the assertion that Petitioner had been given a suspended sentence on his prior state court conviction because of a procedural issue in the state courts.

counsel's failure to provide documentation at his initial sentencing.  Because Petitioner has received the benefit of the argument he now claims should have been made at his initial sentencing, he suffered no prejudice as a result of counsel's failure to provide the necessary documentation at his initial sentencing.  As Petitioner cannot show that he suffered any prejudice in light of his resentencing, this claim of ineffective assistance of counsel is without merit and must be denied.[6] *Cross*, 308 F.3d at 315.

Petitioner also alleges that Liebesman was ineffective at sentencing in failing to dispute the factual basis of his prior conviction regarding whether Petitioner fired at an ex-girlfriend's tires while she was in the car, to his satisfaction.  As to this claim Petitioner cannot show that he was prejudiced.  During his initial sentence, the parties disputed the factual basis for the conviction in question.  This Court, however, refused to take into account either side's recounting of the alleged factual basis for the conviction, and considered it only to the extent that it contributed to Petitioner's criminal history category.  (*See* Document 16 attached to ECF No. 34 at 60-61).  This Court did not base either of the sentences issued, at the first or second sentencing, on any conclusion as to the factual basis for that prior conviction or any aspect of that prior conviction other than its existence and the effect that existence had upon Petitioner's criminal history category.  Because this Court did not consider the disputed factual basis for the prior conviction at

---

[6] In his reply brief, Petitioner also attempts to argue that Liebesman was ineffective because she stated during sentencing that the mandatory minimum applicable sentence was 120 months, rather than 60 months.  (ECF No. 38 at 21).  As with the other argument, any misstatement Liebesman may have made about the mandatory minimums at sentencing is immaterial because Petitioner was resentenced and his resentencing counsel was more than capable of addressing any such issues.  At any rate, because Petitioner would not have received a sentence below 120 months regardless, Petitioner was clearly not prejudiced by this statement.  Thus, even if this Court were not to consider this argument an improper point raised on reply, *see Judge*, 119 F. Supp. 3d at 284 (a moving party may not raise new issues or new facts in his reply brief, and any point so raised may be disregarded), Petitioner's claim fails to show any resulting prejudice, and is thus without merit.

either sentencing for the purposes of the sentence issued, Petitioner was not prejudiced by counsel's alleged failure to dispute those facts to Petitioner's liking.  Petitioner's sentence was not increased because of the nature of that prior offense, and had counsel more thoroughly challenged the factual basis for that offense contained in the presentence report, no benefit would have accrued to Petitioner in his sentence.  As such, Petitioner cannot show that he was prejudiced by counsel's alleged failings, and Petitioner's ineffective assistance claim must fail.  *Judge*, 119 F. Supp. 3d at 280-81.

Petitioner also contends that counsel was ineffective when she was unable to procure for him a second interview prior to the production of the presentence report after Petitioner refused to speak with probation when offered an initial PSR interview.  Initially, the Court must note that Petitioner again fails to demonstrate what prejudice he suffered from his lack of a second chance at an interview after he refused the initial interview.  In support of his claim, he simply reiterates his argument that the factual basis for one of his prior state convictions, involving his ex-girlfriend's car, could have more readily been disputed had he been given the opportunity to speak with probation.  As discussed above, this Court did not consider that factual basis in arriving at his sentence, and Petitioner suffered no prejudice as a result.  As to prejudice, Petitioner otherwise suggests that, had he been interviewed, probation would have developed more facts that might have changed his sentence.  Petitioner does not specify what additional information would have been discovered beyond his contentions regarding his prior conviction nor how that information would have benefitted him.  Petitioner has thus failed to provide any basis for a finding of prejudice, and his claim must fail for that reason.  *See Palmer*, 592 F.3d at 395.

In any event, it was Petitioner who refused the initial interview.  (*See* PSR at ¶ 78).  Counsel thereafter requested a second interview, but was denied that chance by Probation following

43

Petitioner's refusal to be interviewed.  (*See* Document 16 attached to ECF No. 34 at 64).  Thus, the blame for Petitioner's inability to be interviewed by Probation falls not on counsel, who did attempt to acquire a second chance for Petitioner to be interviewed, but on Petitioner himself for refusing his initial interview.  Thus, Petitioner cannot show that it was counsel's deficient performance, rather than his own obstinance, that robbed him of the opportunity to be interviewed. Petitioner's claim must fail for that reason as well.[7]

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because the claims raised in Petitioner's amended motion to vacate are without merit and Petitioner's supplemental claims are time-barred and otherwise without merit for the reasons expressed above, jurists of reason would not disagree with this Court's denial of Petitioner's motion to vacate sentence, and Petitioner's claims are inadequate to deserve encouragement to proceed further.  This Court therefore denies Petitioner a certificate of appealability.  *Id.*

---

[7] Even were this not the case, it is doubtful that Petitioner's claim as to the PSR interview would be sufficient to make out ineffective assistance of counsel.  *See, e.g., United States v. Benlian*, 63 F.3d 824, 826-28 (collecting cases holding that PSR interview is not a critical stage and that criminal defendants therefore cannot make out an ineffective assistance claim based on counsel's alleged failings in regard to a PSR interview).

## V.  CONCLUSION

For the reasons set forth above, Petitioner's motion for discovery (ECF No. 38) is DENIED, Petitioner's amended motion to vacate his sentence (ECF Nos. 6, 22) is DENIED, and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.


Dated: October 31, 2016                    *s/Susan D. Wigenton*
                                           Hon. Susan D. Wigenton,
                                           United States District Judge

45